**Richard Lee WHITE, Appellee,**

v.

**NORTHWESTERN BELL TELEPHONE COMPANY a/k/a Mountain States Telephone and Telegraph Company a/k/a US West Communications, Inc., Appellants.**

No. 93–210.

Supreme Court of Iowa.

March 23, 1994.

George A. Carroll, Minneapolis, MN, for appellants.

Joel W. Bittner, Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and NEUMAN, JJ.

NEUMAN, Justice.

This appeal stems from a dispute between an employee and his former employer over payment of medical expenses under a settlement agreement approved by the Iowa Industrial Commissioner. The main issue is whether settlement approval under Iowa Code section 85.35 (1991) terminates the commissioner's jurisdiction over subsequent claims arising from the agreement. The district court assumed jurisdiction over the dispute and awarded the employee compensatory and punitive damages. We affirm in part, reverse in part, and remand for entry of judgment in accordance with this opinion.

Until his retirement in 1979, appellee Richard White worked for thirty-one years as a telephone installer for appellant US West.[1] He claimed to have incurred a work-related back injury, and sought workers' compensation benefits. US West disputed both the source of White's injury and the degree of his disability. Eventually the parties negotiated a compromise case settlement pursuant to Iowa Code section 85.35 (1979), which was approved by the industrial commissioner in March 1980.

Under the settlement, US West agreed to furnish future medical care to the claimant of the same kind and to the same degree as would be required of the employer under the Iowa Workers' Compensation Act had settlement not been approved and had claimant's injuries been held by the indus-

trial commissioner to have been compensable.

The agreement further provided:

Furnishing of future medical care by the employer is not a determination of entitlement to such care under the Iowa Workers' Compensation Act, but rather, is furnished under denial of liability and pursuant to the agreement of the parties in full, final and complete settlement of their disputes.... This approval is binding upon the parties and shall not be construed as an original proceeding. This approval constitutes a final bar to any further rights arising under chapters 85, 85A, 86 and 87 Code of Iowa, except further medical treatment under § 85.27 of the 1979 Code of Iowa. Payment under this Order shall not be construed as the payment of weekly compensation.

Until 1985, the parties proceeded without relative incident under the agreement. During most of this time, White submitted his medical bills for review by US West's benefits committee; on approval, payment was made directly to White, who in turn paid the health care provider. Sometime in 1984, however, US West changed its payment policy. Thereafter White's bills were reviewed at US West's Des Moines office by its workers' compensation manager, Kathie Hungerford. Hungerford's position evolved to the point of possessing nearly total discretion to approve or deny a claim and, upon her approval, payment was sent directly to the provider. This change in practice proved to be the catalyst for the controversy now before us.

For a number of years, White's doctors prescribed the drug Percodan for pain control. US West approved payment. In September 1985, however, US West informed White that, despite objections from his attending physician, the company would no longer pay for Percodan prescriptions. Dr. Lawrence Staples, US West's medical director, cited the addictive potential of the narcotic drug as the ground for the decision. Dr. Staples offered White alternatives to

1. White was employed by Northwestern Bell Telephone Co., whose corporate successor is US West Communications, Inc. For simplicity, we refer to appellant throughout this opinion as US West.

Percodan such as pain clinic therapy or treatment with less addictive analgesics. White sought the advice of Dr. James Blessman, a physician at Mercy Hospital's pain clinic, who recommended against such therapy because of the age of White's injury. White testified at trial that he told Hungerford of Dr. Blessman's recommendation, but she denied such knowledge. She did admit, however, that she reviewed and authorized payment of Dr. Blessman's consultation bill.

White remained on Percodan and continued until 1990 to submit his prescription bills to Hungerford. Dr. Burton Routman, White's treating physician, testified that he kept White on Percodan because he knew of no other viable means to control White's pain. Despite this information, US West remained steadfast in its policy of denying Percodan coverage. Blue Cross/Blue Shield, administrator of White's health insurance plan,[2] also denied payment because the prescription was related to an on-the-job injury properly covered by workers' compensation insurance. US West was fully aware of the bind this created for White, but his Percodan bills continued to go unpaid.

Further controversies arose between the parties. In May 1986, White received a prescription for a therapeutic contour chair to alleviate his back pain. Hungerford forwarded the prescription to Dr. Staples, who advised her that US West would likely have to approve the chair as part of White's continued treatment. Upon receiving this response, Hungerford wrote to Dr. Staples, stating, "I don't know if it makes any difference, but do you realize this chair is *$3,220!*" After further consultation with US West's legal department, Hungerford rejected the claim on the basis that the chair was not a "reasonable and necessary" medical appliance.

By 1988, White was living part of each year with his daughter in Phoenix, Arizona. Dr. D.C. Delbridge, White's treating physician in Phoenix, opined that White would ·benefit from regular use of a jacuzzi or hot tub. Given this recommendation, White ap-

proached Hungerford about the idea of a health club membership. Hungerford reluctantly approved the $400 annual membership fee. Later that year, when the health club went bankrupt and White requested a new membership at a different facility, Hungerford denied the request. She cited the lack of proven medical benefit and suggested White consult a physical therapist for appropriate care.

In 1989, US West began what Hungerford described as "aggressive case management" in an effort to control costs in all its workers' compensation files. Hungerford wrote White to inform him that:

> No more unauthorized medical expenses will be paid by Northwestern Bell/US West Communications for your treatment. All prescriptions, examinations and medical "appliances" . . . must be authorized in advance except in the event of a true medical emergency.

Hungerford described a "true medical emergency" as a "life-threatening" situation necessitating hospital care. She did not consider White's regular course of treatment such an emergency. Hungerford also testified that the company wanted White to establish an authorized primary care physician. Although White had consistently sought treatment from Dr. Routman in Des Moines and Dr. Delbridge in Phoenix, and US West had previously authorized their care, Hungerford expressed uncertainty whether US West would have chosen these particular physicians. Therefore, she concluded, it was necessary for White to obtain pre-approval before future consultation.

White testified that, pursuant to this new policy, he obtained authorization from US West's medical director in Arizona for appointments with Dr. Marjorie Auerbach. US West, however, never paid Dr. Auerbach's bills. US West paid Dr. Delbridge's bills until January 1990, but thereafter refused compensation for any unauthorized treatments. In what became a test of wills, White continued consulting Dr. Routman and a physician in Davenport, but all bills from these

2. US West is a self-insured employer, paying employees' medical expenses as part of its retirement benefits. Blue Cross/Blue Shield acts only as administrator of this insurance plan and receives no premiums.

physicians were rejected by US West. Hungerford testified that the rejection was based on White's persistent failure to obtain prior approval and US West's belief that it could settle the matter without litigation.

In March 1990, White brought an action before the industrial commissioner concerning his various disputes with US West under the settlement agreement. The industrial commissioner ruled that it lacked jurisdiction to resolve the disputes pursuant to Iowa Code section 85.35. White then filed an original action in district court, alleging breach of the settlement agreement, bad-faith failure to pay medical claims, and intentional infliction of emotional distress. US West's motion to dismiss for lack of subject matter jurisdiction was denied. The court found that US West breached the settlement and awarded White $8949.46 plus interest for unpaid medical and pharmaceutical bills. It also ruled that US West's breach was intentional and wrongful and awarded White $50,000 in punitive damages. The court denied White's claim of severe emotional distress. It further denied recovery for bad-faith failure to pay workers' compensation benefits, noting that the law had not yet extended the tort to a self-insured employer. This appeal followed.

US West asserts on appeal that the district court erred (1) by failing to find it lacked subject matter jurisdiction over the controversy, (2) in ruling that US West had breached the settlement agreement, (3) in its assessment of compensatory damages, and (4) by awarding punitive damages. White cross-appeals the court's denial of his bad-faith claim. We shall consider the parties' arguments in turn.

■ I. *Subject matter jurisdiction.* In overruling US West's motion to dismiss for lack of jurisdiction, the district court found the language of the settlement agreement dispositive. It determined that White's right to medical benefits arose solely from the agreement, and not from the workers' compensation act; the industrial commissioner made no determination that White's injuries were work-related. We review the court's ruling on subject matter jurisdiction for the correction of errors at law. Iowa R.App.P. 4;

*Tigges v. City of Ames,* 356 N.W.2d 503, 512 (Iowa 1984).

■ US West asserts that only the industrial commissioner has jurisdiction over White's claims. It relies heavily on Iowa Code sections 85.3 and 85.20 to support this contention. US West's reliance on these sections in the context of this section 85.35 contested case settlement, however, is misplaced.

■ An employee's rights and remedies, at common law or otherwise, arising from a job-related injury are governed exclusively by the workers' compensation act under the jurisdiction of the industrial commissioner. *See* Iowa Code § 85.20; *Harned v. Farmland Foods, Inc.,* 331 N.W.2d 98, 99 (Iowa 1983). The exclusivity principle of the act, however, is limited to matters surrounding a job-related injury. *Tallman v. Hanssen,* 427 N.W.2d 868, 870 (Iowa 1988); *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 12 (Iowa 1990). In the case before us, US West disputed whether White's back injury arose out of his job as a telephone installer. Indeed, the industrial commissioner's approval of the parties' settlement agreement was contingent upon the existence of such a dispute. *See* Iowa Code § 85.35(1). This resolution obviated any finding that White's injury was work-related; his right to medical care arose solely from the agreement. Any claim by US West to the contrary is without merit.

■ Our conclusion is supported by the language of section 85.35 itself. The section reads in pertinent part:

> Notwithstanding any provisions of this chapter and chapters 85A, 85B, 86 and 87, an approved settlement shall constitute a final bar to any further rights arising under this chapter and chapters 85A, 85B, 86 and 87.

Iowa Code § 85.35. We believe this language evinces a legislative intent to terminate the jurisdiction of the industrial commissioner upon settlement approval. Any claims arising out of a settlement approved under section 85.35 are therefore properly brought in an original action before the district court.

US West nevertheless asserts that the commissioner intended to retain jurisdiction over this matter. It cites a portion of the agreement, patterned after section 85.35, in which the commissioner stated:

> This approval constitutes a final bar to any further rights arising under Chapters 85, 85A, 86 and 87 Code of Iowa, *except further medical treatment under § 85.27* of the 1979 Code of Iowa.

(Emphasis added.) US West contends that disputes regarding reasonable medical care under section 85.27 remained, therefore, before the commissioner. We disagree. As already noted, approval of a contested case settlement terminates the industrial commissioner's jurisdiction. Nothing in the agreement could revive that jurisdiction once terminated. *See State ex rel. Iowa State Highway Comm'n v. Read,* 228 N.W.2d 199, 202 (Iowa 1975) (subject matter jurisdiction granted by law and not by agreement of parties). US West's assignment of error is therefore without merit.

■ II. *Breach of the settlement agreement.* The district court found that US West breached the settlement agreement by unreasonably attempting to change White's course of treatment and by failing to provide him with prompt alternative care. US West asserts on appeal that its contractual obligation carries with it the privilege of selecting appropriate care, thereby justifying its refusal to pay for unauthorized treatment. It contends the court erred in finding otherwise. We review the court's ruling for errors at law. Iowa R.App.P. 4. The ruling is subject to reversal only if the court's findings are not supported by substantial evidence or are contrary to law. *Yeggy v. Iowa Dist. Court,* 397 N.W.2d 506, 507 (Iowa 1986).

■ The parties' agreement stated that, while medical care would not be furnished under the workers' compensation act, Iowa Code section 85.27 would provide guidance in determining their mutual rights and obligations. That section reads in pertinent part:

> [T]he employer is obliged to furnish reasonable services and supplies to treat an injured employee, and has the right to choose the care. The treatment must be

offered promptly and be reasonably suited to treat the injury without undue inconvenience to the employee.

Iowa Code § 85.27. White contends US West breached its duty under this section by failing to pay for his Percodan prescriptions, his primary care physicians, the contour chair, and the health club membership. With the exception of the health club membership, we agree.

For nearly two years, US West paid White's prescriptions for Percodan. Dr. Staples then informed White that the company would no longer authorize such treatment, citing the potential for Percodan addiction. Although he offered White alternative treatments, the evidence demonstrated that these alternatives were not reasonably suited to treat White's injury. Dr. Blessman told White that his injury was too old for the benefits of pain clinic therapy. Dr. Routman testified that analgesics other than Percodan were inadequate to alleviate White's severe pain. US West presented no evidence to refute these medical opinions.

After consenting for nearly nine years to White's choice of physicians, US West suddenly informed him that it would no longer pay for consultations without pre-authorization. US West offered no medical reason for such an abrupt policy change nor did it demonstrate why White's primary care physicians were unsatisfactory. Furthermore, the record contains no evidence that US West directed White to physicians it deemed appropriate. White testified that when he initially complied with the new policy and obtained authorization, US West did not pay his bills. The company offered no explanation for such failure.

US West also refused to honor White's prescription for a therapeutic contour chair. The record reveals that it was the chair's cost, not lack of medical necessity, that prompted US West's decision. Again, upon rejection of White's claim, the company offered no prompt treatment alternatives.

■ In summary, substantial evidence supports the district court's finding that US West breached the settlement agreement

with respect to White's claims for prescription drugs, physician consultations, and the contour chair. In spite of the requirement that US West offer White prompt and reasonable treatment for his injury, it appears that US West's rejections of White's claims were motivated primarily by economic concerns and not by any legitimate questions over the medical necessity of the treatments. The mere fact that performance of this contract became economically burdensome to US West does not excuse its performance. *Yager v. Farmers' Mut. Tel. Co.,* 323 N.W.2d 245, 249 (Iowa 1982). In addition, the record reveals that when US West denied payment for White's chosen course of treatment, it invariably neglected to offer appropriate alternatives.

US West was also contractually obligated to treat White's injury without undue inconvenience. The evidence shows that its failure to suggest viable alternatives and its demonstrated lack of commitment to promptly resolve White's claims forced him to advance the cost of treatment or, more often, forgo treatment altogether. These actions resulted in considerable hardship for White and constituted a breach of US West's contractual obligation. The record amply supports the district court's judgment for White on these claims.

■ We differ, however, with the court's holding with respect to the health club membership. White testified that use of the club's jacuzzi relaxed his lower back and gave him temporary relief. US West responded by offering to pay for physical therapy in lieu of the membership. White evidently made no attempt to pursue this course of treatment, and the record is silent on whether physical therapy was an inadequate alternative. The medical benefits of jacuzzi therapy, however, were seriously called into question at trial. Indeed, White's own treating physician, Dr. Routman, voiced skepticism over the advantages of such therapy for someone with White's condition. US West was not contractually obligated to pay for care not reasonably suited to treat White's injury. Consequently, its refusal to pay this claim is not evidence of breach entitling White to recovery. *See Taylor Enter., Inc.*

*v. Clarinda Prod. Credit Ass'n,* 447 N.W.2d 113, 116 (Iowa 1989) (material conditions must be fulfilled by party bringing suit to recover on contract).

■ III. *Damages.* The district court awarded White $2847.88 for unpaid Percodan prescriptions, $2439.58 for physicians' bills, $3220 for the contour chair, and $442 for the health club membership. US West contends that it paid for $1061.83 of these prescription bills and $1302.79 of the physicians' bills under its self-insured health care plan. Because these items were paid, albeit not pursuant to the settlement agreement, US West contends the court erroneously awarded White a duplicate recovery.

We agree with the trial court that US West, as the party in breach, should not benefit from payments made under a separate health care plan. The purpose of compensatory damages is to place the injured party in the position he or she would have occupied had the contract been performed. *Macal v. Stinson,* 468 N.W.2d 34, 36 (Iowa 1991). Had US West performed its obligations under *this* agreement, it would have paid the amounts awarded. Judgment for this sum, plus interest, was therefore proper. We express no opinion regarding whether White may be obligated to indemnify the health care plan. That question was not before the district court and is thus beyond the scope of this appeal.

■ US West also contends that because White did not purchase the contour chair, he is not entitled to recover its price. In support it cites *Krohn v. State,* 420 N.W.2d 463, 464–65 (Iowa 1988), in which we held that a workers' compensation claimant was not entitled to an award of medical expenses absent a showing that he personally paid the suppliers. *Krohn* does not control, however, because it involved interpretation of the employer's obligation under the workers' compensation act. US West's obligations arise from the settlement contract. White lacked sufficient funds to purchase the chair personally. Had the contract been performed, he would have been able to make the purchase. Judgment for the chair's price merely placed White in the position he would have held had

US West not been in breach. *Macal,* 468 N.W.2d at 36. The district court was correct in so ruling.

■ IV. *Punitive damages.* Finally, US West challenges the district court's award of punitive damages. It contends that because White's claim rests on nothing more than breach of contract, the court's award was improper. Again, our review is for the correction of errors at law. Iowa R.App.P. 4; *Hockenberg Equip. Co. v. Hockenberg Equip. & Supply Co.,* 510 N.W.2d 153, 156 (Iowa 1993).

■ Generally a breach of contract, even if intentional, will be insufficient to support a punitive damage award. *In re Mt. Pleasant Bank & Trust Co.,* 455 N.W.2d 680, 685 (Iowa), *cert. denied,* 498 U.S. 898, 111 S.Ct. 251, 112 L.Ed.2d 209 (1990); *Berryhill v. Hatt,* 428 N.W.2d 647, 656 (Iowa 1988). Punitive damages may be awarded for breach of contract, however, upon proof of two things: (1) that the breach also constitutes an intentional tort, and (2) that the breach was committed maliciously, in a manner meeting the standards of section 668A.1.[3] *Hockenberg,* 510 N.W.2d at 156.

In support of its punitive damages award, the court found that US West wrongfully denied White's claims for "no reason other than it viewed the cost as too much." It also found that US West's refusal to make payments for the year and one-half prior to litigation constituted an unwarranted attempt to coerce White into settlement. The question is whether these findings are sufficient to sustain the court's award.

■ The court's first ground appears to be based on a finding of bad faith on the part of US West. *See Dolan v. Aid Ins. Co.,* 431 N.W.2d 790, 794 (Iowa 1988) (recognizing bad-faith claim based on absence of reasonable basis for denying benefits and insurer's knowledge or reckless disregard of lack of reasonable basis for denying claim). The ruling is curious given the court's separate determination that a bad-faith cause of action against a self-insured employer had not yet been recognized. The court's ruling, of course, preceded our decision in *Reedy v. White Consolidated Industries, Inc.,* 503 N.W.2d 601 (Iowa 1993). There we held that bad-faith liability may extend to self-insured employers. *Id.* at 603. Our decision in *Reedy,* however, is not dispositive of the case before us.

*Reedy* and its predecessors recognized the tort of bad faith in the context of insurance contracts. *See Dolan,* 431 N.W.2d at 790 (automobile insurance carrier); *Boylan v. American Motorists Ins. Co.,* 489 N.W.2d 742, 744 (Iowa 1992) (workers' compensation insurance carrier). Our concern focused on the inherently unequal bargaining power between an insurer and insured arising from the fact that insurance policies are contracts of adhesion. *Dolan,* 431 N.W.2d at 794. Implicit in *Reedy* is the idea that employees of qualified self-insured employers suffer from the same unequal bargaining power prompting our decision in *Dolan. See Reedy,* 503 N.W.2d at 602–03.

The distinguishing factor here is that White's right to medical care does not arise out of an insurance contract, but out of the parties' settlement agreement. This agreement resulted from negotiations between US West and White, who was represented throughout by counsel. Moreover, the parties' agreement was approved by the industrial commissioner. Thus the concerns expressed in *Dolan* regarding unequal bargaining power are not implicated. We therefore hold that while US West's failure to pay White's claims constituted a breach of its contractual obligations, its conduct furnished no basis for an intentional tort claim premised on insurer bad faith.

■ The court also based its punitive damage award on a finding that payments were denied in an effort to force White to settle his claim. Again, however, we are confronted with a claim not recognized in tort. While we agree that US West's treatment of White was shabby, merely objectionable conduct is insufficient to meet the stan-

---

**3.** Iowa Code § 668A.1 requires proof by a preponderance of clear, convincing and satisfactory evidence that the conduct amounted to a willful and wanton disregard for the plaintiff's rights or safety.

dards of section 668A.1. *Hockenberg*, 510 N.W.2d at 156; *Beeman v. Manville Corp. Asbestos Comp. Fund*, 496 N.W.2d 247, 255 (Iowa 1993).

We conclude therefore that the district court erred in awarding White punitive damages. In addition to the reasons already cited, we note that the court found insufficient evidence to sustain White's claim of intentional emotional distress. White has not challenged that ruling on appeal, nor would the record appear to support such a claim. Because US West's breach of contract did not meet the threshold requirement of also constituting an independent tort, the allowance for punitive damages was inappropriate. *Higgins v. Blue Cross*, 319 N.W.2d 232, 236 (Iowa 1982). Our ruling necessarily disposes of White's cross-appeal argument that the district court's decision on his claim for bad faith was in error.

V. *Conclusion.* We affirm the district court's ruling on breach of settlement regarding White's claim for Percodan prescriptions, physicians' bills, and the contour chair, and its award of damages therefor. We reverse the court's ruling regarding White's claim for the health club membership and its award of punitive damages. We remand for entry of judgment consistent with our opinion. The clerk shall tax the costs of this appeal equally between the parties.

**AFFIRMED IN PART AND REVERSED IN PART ON THE APPEAL; AFFIRMED ON THE CROSS-APPEAL AND REMANDED.**